Filed 4/8/21  Adler v. Superior Court CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| YANINA ADLER, | D075033 |
| Petitioner, | (Super. Ct. No. DN181729) |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| MARK J. ADLER, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING in mandate.  Patti Ratekin, Commissioner.
Appeal dismissed.  Petition granted in part and remanded with directions.

Yanina Adler, in pro. per.; Ball Law Corporation and Jonathan S. Ball
for Appellant.

Higgs Fletcher & Mack, John Morris and Rachel E. Moffitt for
Respondent.

In this dissolution action, the trial court found the premarital
agreement (PMA) signed by Yanina Adler and Mark Adler (together, the

parties) was enforceable. Yanina appeals from the subsequent bench trial on reserved issues arguing that the trial court erred in determining her claims for: (1) reimbursement of income tax payments; (2) recalculation of the benefits paid at the termination of a defined benefit pension plan that the parties created for themselves; and (3) reimbursement of the salary she earned at the parties' corporation. Yanina's appeal is dismissed and we exercise our discretion to treat the appeal as a petition for writ of mandate. We conclude that the trial court committed a legal error by requiring nontaxable transfers of money between spouses be treated as taxable income in determining whether either party was entitled to reimbursement of income tax payments. We otherwise reject Yanina's arguments.[1] Accordingly, we grant the petition for writ of mandate in part and remand the matter to the trial court for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

We forego a detailed recitation of the facts and instead briefly summarize the factual history of the parties' relationship. The discussion provides additional background related to the specific claims at issue in this proceeding.

Mark is a physician with his own medical practice and equity interests in various health-related businesses, such as WebMD, Inc. (WebMD), where he served on the board of directors. Yanina has a Ph.D. in physiology and was the CEO of her own biotech startup company. The couple started dating in 1999. Mark had one prior marriage and Yanina had two prior marriages. Each party has two children, but no children together.

---

[1]    Mark's motion to strike Yanina's oversized reply brief is denied.

2

Before their marriage, the parties, each represented by separate counsel, negotiated a PMA. At this time, Yanina was employed as the program director in the gene therapy division at a medical school and earned approximately $60,000. Mark earned approximately $500,000 from his medical practice. The PMA preserved the separate property status of the assets each party owned before the marriage as well as each party's earnings during the marriage. Both parties waived spousal support. The parties married in November 2001.

In December 2001, the parties formed MDNA, Inc. (MDNA). MDNA performed consulting services for Mark's medical group, who was MDNA's only paying client. Initially, the parties were 50 percent shareholders in the corporation. In 2006, Yanina became the 95 percent shareholder, and Mark the 5 percent shareholder. MDNA paid salaries to Mark and Yanina and reported these salaries on W-2 forms.

In late January 2015, Mark petitioned for dissolution of the marriage. The trial court granted Yanina's motion to bifurcate the case to first resolve her challenges to the validity of the PMA and then decide the issues of property division and reimbursement. On January 23, 2018, the court entered its "[j]udgment on bifurcated issue" finding that the parties' PMA was valid.

On August 24, 2018, after considering the parties' trial briefs, nine days of testimony, and written closing arguments, the trial court issued its statement of decision for the second phase. On August 28, 2018, the court entered its "[j]udgment on reserved issues" which, among other things, reserved jurisdiction to carry into effect its order regarding the parties' income taxes, and division of the parties' furniture and furnishings should the parties not be able to agree. On

3

October 25, 2018, Yanina, now in propria persona, filed her first notice of appeal from the August 28, 2018 judgment.

On February 26, 2019, the court entered its statement of decision on reserved issues after trial to address prevailing party status, attorney fees, costs, and sanctions. On April 17, 2019, the court entered its "[j]udgment on reserved issues (FINAL)."[2] Therein, the court ordered that Mark contribute $500,000 to Yanina's attorney fees based on his "ability to pay for legal representation of both parties." The court deemed Mark to be the "prevailing party" and awarded him $700,000 in attorney fees. The trial court also sanctioned Yanina $10,000 under Family Code section 271. That same day, Yanina filed her second notice of appeal from the February 26, 2019, statement of decision on reserved issues.

On July 30, 2019, the court held a hearing and issued findings and an order that, among other things, stated it would adopt the report of Mark's expert on the income tax issue unless Yanina's expert presented an evaluation of the tax issue within 30 days. This order also awarded certain furniture and furnishings to Mark.

On November 4, 2019, the trial court issued an order stating that it resolved Yanina's motion regarding the division of household furniture and furnishings at the July 30, 2019 hearing. As to income taxes, the court stated that it provided a mechanism for resolution of this issue at the July 30, 2019 hearing and that "the order of July 30, 2019 controls the tax issue." The court also declared Yanina to be a vexatious litigant.

---

[2] We refer to the April 17, 2019 judgment as the "April judgment."

4

DISCUSSION

I.

*Appealability*

"California is governed by the 'one final judgment' rule which provides 'interlocutory or interim orders are not appealable, but are only "reviewable on appeal" from the final judgment.' [Citation] The rule was designed to prevent piecemeal dispositions and costly multiple appeals which burden the court and impede the judicial process." (*Doran v. Magan* (1999) 76 Cal.App.4th 1287, 1292-1293.) "The existence of an appealable judgment is a jurisdictional prerequisite to an appeal" which we are obligated to review. (*Id.* at p. 1292.)

In her reply brief, Yanina contends for the first time that the trial court has not yet issued an appealable final judgment that resolved all claims. She asserts we should dismiss this appeal without prejudice and instruct the trial court to enter a final judgment that resolves all claims in this litigation so that she may appeal from that final judgment. She argues that the court's April judgment is not appealable because it did not finally resolve her income tax reimbursement claim or the division of household furniture and furnishings.[3] Mark urges— for reasons of efficiency, economy, and fundamental fairness—that this appeal proceed and be resolved on its merits. He argues that this outcome can be achieved consistent with the law through any one of three separate analyses, including treating the appeal from the April interlocutory judgment as a petition for writ of mandate. In her response to Mark's supplemental brief, Yanina does not object to the

---

[3] We requested and received from Mark a supplemental letter brief on this issue. We also accepted an unsolicited response from Yanina.

5

matter proceeding as long as we are able to resolve all issues on their merits.

As detailed in the factual and procedural background, the trial court entered "[j]udgment on bifurcated issue" after the first trial phase. After the second trial phase, the court entered a "[j]udgment on reserved issues" which reserved jurisdiction to resolve the parties' dispute regarding income taxes and the division of household furniture and furnishings. On February 26, 2019, the court entered its statement of decision after trial on reserved issues to decide prevailing party status, attorney fees, and sanctions.

The court then entered the April judgment stating that the "judgment here fully incorporates by this reference the Court's judgment filed on August 28, 2018 and the Court's statement of decision and ruling after trial on reserved issues filed on February 26, 2019, *and is the final judgment of this Court*." (Italics added.) Thus, the April judgment expressly incorporated the August 28, 2018, judgment (the August 2018 judgment) which ordered the parties to prepare a list of furniture and furnishings claimed to be community property. If a dispute existed over the character of an item, the person claiming the property is separate property was ordered to provide their evidence to the other party through counsel and the court reserved jurisdiction to resolve the dispute. The court also ordered the parties to meet and confer regarding their income taxes and created a process to resolve the issue. The court also reserved jurisdiction over the income tax issue. On April 17, 2019, Yanina, in propria persona, filed her second notice of appeal from the February 26, 2019, statement of decision and ruling on reserved issues. Thereafter, the court's July 30,

6

2019 order after hearing stated the court would adopt the report of Mark's expert on the income tax issue unless Yanina's expert presented an evaluation of the tax issue within 30 days. On November 4, 2019, the trial court issued an order stating that it resolved the income tax issue at the July 30, 2019 hearing.

" 'In "determining whether a particular decree is essentially interlocutory and nonappealable, or whether it is final and appealable . . . [i]t is not the form of the decree but the substance and effect of the adjudication which is determinative. As a general test, which must be adapted to the particular circumstances of the individual case, it may be said that where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory." ' " (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1216.)

The April judgment incorporated the August 2018 judgment. The August 2018 judgment left two issues unadjudicated—household furnishings and income taxes. The August 2018 judgment provides that the parties are to attempt to agree on a resolution of each of these items, and if not, the court would resolve these issues in some future order. The subsequent April judgment incorporated by reference the August 2018 judgment, but did not adjudicate the household furnishings and income tax issues left open in the August 2018 judgment. Rather the April judgment, by incorporating the August

7

2018 judgment, contemplated further judicial action in the event the parties could not agree.

Where, as here, a trial court decides most issues and creates a procedure to determine some remaining issues, reserving jurisdiction to resolve any resulting disputes, appellate courts have concluded that the "judgment" was interlocutory and not final. For example, in *Maier Brewing Co. v. Pacific Nat. Fire Ins. Co.* (1961) 194 Cal.App.2d 494 (*Maier*), a dispute arose between plaintiff and its insurance carrier regarding whether plaintiff's insurance policy covered the property where a fire occurred. (*Id.* at pp. 495-496.) In a reformation action, the trial court entered judgment reforming the policy to include the disputed property. (*Id.* at p. 496.) The judgment required the parties to follow procedures prescribed in the policy to determine the amount of the loss, but further provided that "if the parties are unable to agree on the amount of said loss, and further Court action is necessary, the Court retains jurisdiction" to adjudicate the amount of loss and enter judgment for that amount. (*Id.* at p. 497.) The Court of Appeal dismissed the purported appeal because the "judgment" contemplated further judicial action necessary to a final determination of the parties' rights. (*Id.* at pp. 498, 500.) In *Yeboah v. Progeny Ventures, Inc.* (2005) 128 Cal.App.4th 443 (*Yeboah*), in adjudicating certain contract claims, the trial court entered a judgment providing that an accounting firm would conduct audits, and any disputes relating to the accounting would be referred to a special master. (*Id.* at pp. 446-447.) The Court of Appeal held this judgment was not final and not appealable because it was only a " 'provisional determination of some or all issues in the cause.' " (*Id.* at p. 448.)

8

Similar to *Maier*, *supra*, Cal.App.2d 494 and *Yeboah*, *supra*, 128 Cal.App.4th 443, the April judgment is not a final appealable judgment because it did not resolve the household furnishing and income tax issues and contemplated further judicial action on these issues in the event the parties could not agree. "However, (1) under unusual circumstances, and (2) where doing so would serve the interests of justice and judicial economy, an appellate court may use its discretion to construe an appeal as a petition for writ of mandate." (*Mon Chong Loong Trading Corp. v. Superior Court* (2013) 218 Cal.App.4th 87, 92.)

In *Olson v. Cory* (1983) 35 Cal.3d 390 (*Olson*), the California Supreme Court determined that it was appropriate to treat an appeal as a petition for a writ of mandate when "the issue of appealability was far from clear in advance," the records and briefs included the necessary elements for a petition for a writ of mandate, there was nothing to indicate that the trial court would appear separately or become more than a nominal party, and dismissing the appeal rather than exercising the court's discretion to reach the merits would be " ' "unnecessarily dilatory and circuitous." ' " (*Id.* at p. 401.)

All the elements articulated in *Olson*, *supra*, 35 Cal.3d 390 are present here. This is not a case where the issue of appealability was clear in advance. In fact, the trial court contributed to the confusion by expressly labeling the April judgment its "final" judgment in the matter when it was not final. Additionally, the merits of the issues raised by Yanina have been fully briefed, there is no indication that the trial court would appear separately or become more than a nominal party, and failing to reach the merits of the issues raised would be needlessly

9

dilatory.  As a result, we dismiss Yanina's appeal and exercise our discretion to treat the appeal as a petition for a writ of mandate.

II.

*General Legal Principles*

We review the trial court's conclusions of law after a bench trial de novo and its factual findings for substantial evidence.  (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)  Under the substantial evidence standard of review "findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.  [Citation.]  [¶]  A single witness's testimony may constitute substantial evidence to support a finding.  [Citation.]  It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility.  [Citation.]  'A judgment or order of a lower court is presumed to be correct . . ., and all intendments and presumptions are indulged in favor of its correctness.'  [Citation.]  Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' "  (*Ibid.*)

"A party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable."  (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218 (*Doe*).)  The party challenging the court's ruling has a "fundamental obligation to this court, and a prerequisite to our consideration of their challenge" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 737-738), is to "set forth the version of events most favorable to [respondent]"

10

(*ibid.*).  "The duty to adhere to . . . procedural rules grows with the complexity of the record."  (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290.)

Additionally, " ' "[i]t is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations." ' [Citation.]  Because '[t]here is no duty on this court to search the record for evidence' [citation], a reviewing court *may* disregard any factual contention not supported by a proper citation to the record."  (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379 (*Grant-Burton*); see also *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [noting that the California Rules of Court require factual assertions to be supported by citations to the record].)

III.

*Reimbursement of Income Taxes*

A.  Additional Background

Paragraph 6.1 of the PMA provides that the parties "intend to establish a joint [savings and joint checking] account," and that "[f]unds deposited in those accounts shall be community property," with no right of reimbursement to funds deposited into these accounts.  Paragraph 14 of the PMA regarding income tax returns provides:

> "The parties probably will file joint income tax returns.  Neither the filing of such joint tax returns nor the payment of taxes shall create or be deemed to create any community property interest in any assets of either party or any interest of one party in the property of the other party.  *If the parties file a joint tax return, each party should pay the percentage of the joint tax that he or she would have paid of the total tax that would have been paid by both if each had*

11

> *filed a separate tax return and paid their own taxes on such returns.* In other words, the percentage the party's separate tax liability bears to the combined separate liabilities shall be applied to the joint liability. The parties may determine any other appropriate allocation of the joint tax liability and/or joint tax refund to which they mutually agree. The parties may also determine an appropriate allocation of the tax preparation fees. Neither party shall have a right to reimbursement for any alleged payment of the other's taxes on a joint tax return." (Italics added.)

In its proposed statement of decision, the trial court noted that it allowed testimony on whether paragraph 14 of the PMA was ambiguous. It ultimately found paragraph 14 ambiguous regarding the "right to reimbursement for any alleged payment of the other's taxes on a joint return."

In its August 2018 judgment on reserved issues the court directed the parties to meet and confer "to determine whether this provision [of the PMA] was complied with by each party paying their share of the joint tax liability." If the parties could not resolve the issue, the parties were directed as follows:

> "If they are unable to agree they shall mutually agree on a tax preparer to prepare separate returns and ascertain what each parties' separate tax liability would have been. If either party failed to pay their representative share of the taxes, those taxes shall be reimbursed to the community. **The funds deposited into the joint account shall be treated as community property income and each party shall claim one half of those funds on their separate property return**, the payments from the joint account shall be equally divided between the parties." (Bolding added.)

12

The court reserved jurisdiction over this order. Yanina and Mark's counsel exchanged numerous meet and confer letters attempting to resolve the income tax issue. In his final letter, Mark's counsel agreed to retain Brian Brinig, the court's Evidence Code section 730 expert, "to accomplish the tasks required by the [c]ourt's order [regarding the income tax issue], provided that the fees for his service are shared equally." Ultimately, Mark filed a declaration stating that the parties were unable to resolve the income tax issue and that Yanina did not respond to the suggestion to retain Brinig. Mark also filed a report prepared by Anna Addleman. The Addleman report concluded that Mark was entitled to reimbursement of income taxes totaling $59,031 from Yanina. Mark then filed a request for order, asking the trial court to adopt Addleman's findings and award him just over $59,031 on the tax reimbursement issue.

In its order after the July 30, 2019 hearing, the trial court tentatively adopted the conclusions set forth in Addleman's report with the caveat that if Yanina wanted Brinig to evaluate the tax issue addressed by Addleman, Yanina must pay Brinig to complete that evaluation within 30 days of July 30, 2019. If Brinig did not complete his report within 30 days, the Court will "adopt[ ] the recommendations of Ms. Addleman and judgment of $59,031 against [Yanina] in favor of [Mark] shall enter."

Yanina did not timely comply with the court's directive; rather, she filed a response stating that the conclusion she owed Mark almost $60,000 for taxes was an "outrageous abuse of accounting." She also asked the trial court to sanction Mark in the amount of $60,000 for "lying and delaying this case." Mark opposed Yanina's requests. In its

13

November order, the court stated that it provided a mechanism for resolving the income tax issue at the July 30, 2019 hearing and that "the order of July 30, 2019 controls the tax issue."[4]

B. Analysis

Yanina contends that the bolded sentence in the court's instructions commanding that funds deposited into a joint account be treated as community property income and that each party claim half of such deposits on their separate property return, constitutes legal error because it created taxable income where none existed.[5] She argues that the transfer of money by either her or Mark from one of their separate property accounts into a joint checking or savings account is not taxable income under the Internal Revenue Code (IRC) because each party already possessed the money in his or her separate property account.

Yanina also argues that the Addleman report adopted by the trial court, among other things, failed "to calculate each party's separate tax liability for any year" and "calculated each party's taxable income incorrectly." She contends that the mechanism set forth by the trial court should be vacated with instructions that "the trial court to provide a

---

4    Yanina moved to augment the record to include the reporter's transcripts for the July 30 and November 4, 2019 hearings. Mark notes that these hearings took place after Yanina filed her notices of appeal, but does not object to including them in the record in this proceeding because they provide additional information regarding the issues on appeal. We denied the motion without prejudice to the filing of a request for judicial notice because the materials postdate the appealed-from judgments. On February 19, 2021, Yanina filed another motion to augment, alternatively, to take judicial notice of the same transcripts. In the interest of justice, the motion to augment is granted.

5    We refer to the bolded sentence as the challenged provision.

14

replacement that is free of legal error, more clear and hopefully less susceptible to abusive manipulation."

Mark disagrees with Yanina's interpretation of the challenged provision. He contends that the court did not "create taxable income" for either party within the meaning of the IRC because the parties already paid their taxes. Rather, he asserts that the court merely established a process to resolve whether the parties complied with the PMA. Ultimately, Mark submitted expert evidence on the subject; Yanina submitted nothing; and the trial court adopted Addleman's report in an order entered after the April judgment. Mark contends that Yanina's multiple challenges to Addleman's report are moot because she did not appeal the "postjudgment" order adopting Addleman's report.

Paragraph 14 of the PMA provided that, if the parties filed a joint income tax return, the parties were required to "pay the percentage of the joint tax that he or she would have paid of the total tax that would have been paid by both if each had filed a separate tax return and paid their own taxes on such returns." Consistent with this paragraph, the court's August 2018 "[j]udgment on reserved issues" ordered that separate returns be prepared to ascertain what each parties' separate tax liability would have been and, if either party failed to pay their representative share of the taxes, to reimburse those taxes to the community. The court required that the reimbursed taxes be deposited into the joint account, and the challenged provision ordered that these funds "be treated as community property income and each party shall claim one-half of those funds on their separate property return. . . ."

Yanina contends that the trial court committed legal error by requiring that reimbursed funds be treated as "community property income" to then be

15

reported on the parties separate property returns because it created taxable income where none existed. We agree. The parties had already paid the income tax. The only issue before the court was whether one of them paid too much (according to the provisions of the PMA) and was, therefore, entitled to reimbursement. Accordingly, the order is erroneous in two respects, by (1) mischaracterizing any reimbursement as "income" when it is not, and (2) directing such income be reported on separate property returns when the parties had already filed a joint return paying the tax.

Taxable income is defined as "gross income minus the deductions allowed by this chapter. . . ." (26 U.S.C. § 63, subd. (a).) Gross income is defined as "all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, fringe benefits, and similar items; (2) Gross income derived from business; (3) Gains derived from dealings in property; (4) Interest; (5) Rents; (6) Royalties; (7) Dividends; (8) Annuities; (9) Income from life insurance and endowment contracts; (10) Pensions; (11) Income from discharge of indebtedness; (12) Distributive share of partnership gross income; (13) Income in respect of a decedent; and (14) Income from an interest in an estate or trust." (26 U.S.C. § 61, subd. (a).)

Reimbursed taxes, essentially a transfer of money between spouses, does not qualify as taxable income under the IRC. Accordingly, the trial court erred by treating reimbursed taxes as community property income and requiring that the parties then report this "income" on separate property returns. Mark seeks to avoid this conclusion by arguing that the court did not create taxable income because the parties already paid their taxes for every year of their marriage. This argument, however, ignores that portion of the court's order requiring that reimbursed taxes "be treated as community

16

property income" and requiring that each party "claim one-half of those funds on their separate property return." This portion of the court's order anticipates that the reimbursed taxes be declared as taxable income on the parties' future separate tax returns.

Although Mark does not acknowledge this result in his respondent's brief, his counsel did so in a letter to Yanina. After setting forth the challenged provision, the letter noted that Mark deposited "substantial" funds into the parties joint account and that "[t]he Court's order requires you to accept, as community property income [and] claim one-half of that amount on your separate return. The result of doing so creates a substantial tax liability for you, which you must then reimburse to the community. The circumstances do not, as you contend, result in any reimbursement to you." Thus, as Mark previously recognized, the challenged provision created income and required that Yanina pay taxes on this income. The challenged provision constitutes an error of law because reimbursed taxes constitute a transfer between spouses that does not qualify as income under the IRC. Accordingly, we vacate paragraph 32 of the April judgment and remand the matter to the trial court for further proceedings regarding the income tax issue.

Yanina also challenges the Addleman report adopted by the trial court arguing, among other things, that Addleman failed to follow the court's directions set forth in paragraph 32 of the April judgment. Because Addleman purportedly followed the court's directives in paragraph 32 of the April judgment in preparing her report we vacate that part of the August 30, 2019 order after hearing adopting Addleman's report and that portion of the November 4, 2019 order after hearing regarding the income tax issue. This

17

moots Yanina's remaining arguments regarding the correctness of Addleman's report.

Nonetheless, for the benefit of the parties on remand, we note that paragraph 32 of the April judgment required that a tax preparer "prepare separate returns and ascertain what each parties separate tax liability would have been." Addleman's report does not state that she followed this directive. Rather, it recites that Addleman followed the instructions of Mark's counsel to "Determine if MARK is due a reimbursement from YANINA related to tax payments made from 2009 to 2015." In answering this question, Addleman "relied upon historical financial information provided to [her] firm," not newly-created separate returns as directed by the trial court. Additionally, Addleman's report allocated the joint tax liability according to the "percentage of taxable income after deductions" rather than basing it on "what each parties' separate tax liability would have been" as specified in the PMA and directed by the trial court in the April judgment.

IV.

*Recalculation of Plan Benefits*

A.  Defined Benefit Plan Basics

"A defined contribution plan provides an individual account for each participant in the plan.  It provides benefits to a participant largely based on the amount contributed to that participant's account." (Internal Revenue Service (IRS), Publication 560:  Retirement Plans for Small Business (2011), p. 12.)  "A defined benefit plan is any plan that is not a defined contribution plan.  Contributions to a defined benefit plan are based on what is needed to provide definitely determinable benefits to plan participants." (*Ibid.*)  To establish a defined benefit

18

plan, an enrolled actuary determines the funding levels. (IRS, Choosing a Retirement Plan: Defined Benefit Plan (2020), p. 1.)

A defined benefit plan consists of three documents, the adoption agreement, the basic plan document,[6] and a trust document. "A 'basic plan document' is the portion of a plan containing all the non-elective provisions applicable to all adopting employers." (IRS, Revenue Proc. 2005-16, Pt. I, § 4.03, p. 7.) "An 'adoption agreement' is the portion of the plan containing the options that may be selected by an adopting employer." (*Id.* at § 4.04.) A "controlled group" is defined as "two or more businesses which are owned 80 percent or more by five or fewer shareholders or members, depending on the form of the entity."

IRC section 415 limits the benefits that a qualified defined benefit plan may provide. (26 U.S.C. § 415, hereinafter IRC 415.) To qualify as a defined benefit plan, the plan must not pay benefits which exceed the limitation of subsection (b) of IRC 415. (IRC 415(a)(1)(A).) IRC 415(b)(1) provides that "[b]enefits with respect to a participant [will] exceed the limitation of this subsection if, when expressed as an annual benefit . . ., such annual benefit is greater than the lesser of— (A) $160,000, or (B) 100 percent of the participant's average compensation for his high 3 years."

B. Additional Background

MDNA established the "MDNA, Inc. Defined Benefit Pension Plan" (the Plan) effective January 1, 2003, and amended the Plan on January 1, 2012. On March 5, 2012, the parties approved the adoption agreement and trust agreement. The adoption agreement had check

---

[6]    The basic plan document is also referred to in the record as the "base plan document."

boxes to define a participant's compensation under the Plan. The box checked by the parties defined compensation as "Wages, Tips and other Consideration Box on Form W-2, . . . ."

MDNA also created the "MDNA, Inc. Retirement Trust" (the Trust). The parties, as trustees of the Trust, had "exclusive authority, discretion, and responsibility for the management and control of the assets of the Trust Fund in accordance with the provisions of the Plan. . . ."

MDNA retained Employee Benefits Consultants (EBC) as a third-party administrator to provide actuarial services and prepare its annual tax filings. Effective January 1, 2013, the Plan retained San Diego Pension Consultants (SDPC) to replace EBC. SDPC received the adoption agreement and the trust agreement from EBC. SDPC never obtained the basic plan document.

The Plan assets consisted of two Schwab accounts, one for each party. An enrolled actuary calculated the annual contributions to the Plan under a formula. The parties accrued benefits under the Plan based on several factors, including the benefit formulas in the basic plan document, and the Plan participants' age, compensation, and time until retirement.

In August 2014, the parties in their capacity as directors of MDNA, signed an agreement to terminate the Plan effective September 1, 2014. A benefit election form allows a participant to elect what form of payment they would like to receive, such as a one-time lump sum or an annuitized payment. In October 2014, the parties signed benefit election forms showing a maximum lump-sum distribution of $2,140,387 for Mark and $883,974 for Yanina. The parties also signed

20

substantial owner benefit waiver forms (waiver form). The purpose of the waiver form is to waive benefits to the extent the Plan is underfunded.[7] This is done as a precaution because the actual amount to be distributed is not known until the money is actually moved. In the event of an underfunding the parties cannot obtain their maximum benefits and must negotiate a resolution.

At the time of distribution, the Plan was underfunded and the parties were required to waive benefits. James Peterson, the third-party administrator for SDPC, testified that in an underfunding situation the parties decide who is going to absorb how much underfunding and stated that it is common to have the ultimate distribution be in a ratio to the amounts listed as their maximum amount. SDPC is not involved in this decision.

In calculating Mark's benefit formula, SDPC considered Mark's self-employment income for years 2010, 2011, and 2012, which was his highest compensation for three consecutive years. The Plan ultimately paid $775,900 in benefits to Yanina and $2,056,000 to Mark. These amounts equaled the balances in the two Schwab trust accounts. Accordingly, Yanina waived $108,074 in benefits because this sum constituted the difference between what her benefit formula was at the time of distribution and the value of her earmarked Schwab account.

Yanina argued in her trial brief that the benefits received were improperly calculated using compensation that did not match the parties' W-2 income from MDNA. As a result, Yanina claimed she was shorted approximately $271,000 plus interest since Plan distribution.

---

[7] When a defined benefit plan is underfunded the parties must waive benefits or the company must contribute more money.

In her closing argument, Yanina specified that the dispute concerned Mark's "self-employed income."

At trial, Mark's expert witness testified regarding retirement benefits and taxation of those benefits. Yanina's expert witness testified regarding defined benefit plan regulations and the data utilized in calculating the parties' Plan benefits.

The trial court rejected Yanina's fraud claim and concluded that Yanina did not meet her burden of proving that her Plan benefits were improperly calculated. The court found that all Plan calculations were done in conjunction with the different plan administrators including the concept of backing into compensation,[8] neither party directed the Plan or the use of certain income. Without the basic plan document, the court could not determine whether Mark's sole proprietorship income had been improperly included; thus, the court concluded that Yanina had failed to prove her claim. The court noted that the Plan operated under the premise that the contributions were legal and that Mark's sole proprietorship had adopted the Plan. The court also found the parties agreed that contributions to the Plan would be 75 percent for Mark and 25 percent for Yanina (the percentage breakdown) and that Yanina never objected to the percentage breakdown contributions to the Plan.

---

[8]     Backing into compensation involves an actuary calculating the best way to allocate money between a pension plan and salaries to achieve the desired retirement benefit amount. Peterson and both experts testified that backing into compensation is very common.

C. Analysis

Yanina claims the court erred in denying her request to recalculate the Plan benefits because Mark's sole proprietorship earnings were improperly considered as compensation and eliminating these earnings would result in higher benefits to her and reduce Mark's benefits. Yanina first argues that the Plan's adoption agreement defined compensation to be W-2 income from MDNA and excluded Mark's sole proprietorship earnings. She claims that the missing basic plan document was irrelevant to whether Mark's sole proprietorship income was properly included to calculate the Plan benefits. We agree with the trial court's conclusion that Yanina failed to prove that Mark's sole proprietorship income should have been excluded in calculating the Plan benefits.

The parties' adoption agreement defined compensation under the Plan as "Wages, Tips and other Consideration Box on Form W-2, . . . " Yanina's expert witness testified that gross wages from only MDNA as reflected on W-2 forms could be considered as compensation under the Plan. He also stated that the missing basic plan document contained "boilerplate" provisions and that the adoption agreement contained all discretionary provisions.

Mark's expert witness disagreed. She did not believe that only W-2 tax forms could be considered under the adoption agreement for compensation. She opined that Mark's earned income could properly be considered under the adoption agreement and that earned income could be included when calculating Mark's benefit formula. She testified that SDPC properly included Mark's self-employment income for tax years 2010 to 2012 as compensation under IRC 415 when calculating the parties' final benefits and

23

that every reputable third-party plan administrator would include earned income in such a circumstance.

Mark's expert explained that IRC 415 provides that benefits must be calculated from compensation received from all members of a controlled group of corporations. She stated:

> "So what that means is if there are two corporations that are owned similarly—so if Mark Adler owned two corporations, then you must include his compensation from both corporations when calculating his benefits under [IRC] 415. In this particular case, Mark Adler, as an individual, in tax terms, is called Mark Adler, a sole proprietorship. He himself has self-employment income. So—and that's the same as earned income. Even though it came from WebMD, Inc., he was paid as an independent contractor. And, therefore, he is considered self-employed for purposes of that income. And so as an individual, a sole proprietor, he owned a hundred percent of himself, of his own business. And he owned a hundred percent of MDNA because there is attribution between spouses, which means he is deemed to own everything his spouse owns. So, therefore, he owns a hundred percent of his sole proprietorship and a hundred percent of MDNA. And, therefore, both sources of income—so the income on his self-employment tax return and the income from MDNA must be—or can be considered for compensation under the [IRC] 415 limits."

Mark's expert further explained that the basic plan document cannot be inconsistent with the IRC. "When you read [IRC] 415 and its regulations with specific reference to [IRC] 414, all compensation from controlled group members must be included when determining the [IRC] 415 limit." Thus, she concluded that Mark's sole proprietorship income must be included along with W-2 tax form income from MDNA. She stated that Yanina's expert

24

witness did not consider a controlled group for a sole proprietorship. He only considered WebMD and whether that would be a controlled group. She further explained that the sole proprietorship and MDNA are in a controlled group and that the definition of compensation is expanded when there is a controlled group. Accordingly, Mark's earned benefit was not limited to just the benefit calculated using his compensation from MDNA, but it also included Mark's sole proprietorship compensation.

Peterson explained that the adoption agreement only allows a person to check a box, such as " 'I am choosing W-2.' " The basic plan document might then list a number of items that could be considered W-2 compensation. He stated that W-2 income refers to generic IRS defined type of compensation and is not limited solely to looking at a W-2 form. With respect to the Plan, Peterson stated that SDPC does not take the term " 'W-2' " to mean just wages or salary; rather, the term is a generic reference to the type of compensation chosen. Thus, the adoption agreement and basic plan document needed to be consulted to determine if the definition of compensation in the Plan was limited to W-2 compensation. SDPC, however, never received the basic plan document.

Peterson testified that the basic plan document and adoption agreement work together and that the basic plan document "absolutely" addressed compensation, stating "[i]t is going to have an expanded definition of what the terms used in the adoption agreement refer to or are bound by." Peterson explained that the adoption agreement and basic plan document contain a combination of different potential components that could otherwise be considered compensation for plan purposes. Peterson agreed it "could be a possibility" that the Plan might use only W-2 income to calculate the pension benefit "depending on the full definition" of compensation. Accordingly, if

SDPC had the basic plan document, Peterson expected to see clarification of other components of compensation either included or excluded from the " 'term W-2 compensation.' "9

In summary, the testimony of Mark's expert witness and Peterson support the trial court's conclusions that no error occurred by including Mark's sole proprietorship income in calculating the Plan benefits and that the missing basic plan document was fatal to Yanina's position.

Yanina next contends that Mark's sole proprietorship could not contribute to the Plan without formally adopting it, which it did not do. On this issue, the trial court agreed that Mark's sole proprietorship did not sign the adoption agreement, but noted that the experts disagreed as to whether this was required under the IRC. The evidence supports this finding.

Mark's expert witness disagreed with the testimony of Yanina's expert witness that, to permissibly include income from another company, the other company needed to sign a formal adoption of the Plan, sign the adoption agreement, or be included on the section of the adoption agreement that said controlled group. Rather, where, as here, a controlled group member is a sole proprietorship—"you do not have to formally sign the adoption agreement in order to have your compensation included for [IRC] 415 plan purposes. [¶] Instead, it's just the action of a sole proprietor. He doesn't have to have a board resolution. He just has to say, I'll have my earned income included.

---

9    During trial, Yanina's counsel attempted to authenticate a generic basic plan document that her expert witness obtained from the document's creator. Yanina's expert witness believed that the basic plan document he received was consistent with the document the parties used in 2012. However, questioning by Mark's counsel revealed that the adoption agreement the parties executed could only be used with basic plan document number "01" and the generic basic plan document that Yanina's expert obtained was number "02."

26

And by the documentation that I reviewed, the fact that his earned income was included in the calculations through the advice of all the experts was enough to satisfy me that the sole proprietorship had adopted and agreed to have the earned income included." The trial court found the testimony of Mark's expert witness to be more credible and it is not within our province to reassess witness credibility or reweigh the evidence.

Yanina also argues that no agreement existed to allocate Plan benefits 75 percent for Mark and 25 percent for Yanina. Even if there were, Yanina claims this percentage breakdown would have violated the Plan terms and jeopardized its tax-advantaged status.

Substantial evidence supported the trial court's conclusion that the parties agreed to the percentage breakdown.[10] Based on the documentation, the parties' actions from 2003 to 2014, and the final benefit distribution, Mark's expert opined that the parties had an understanding from the outset of the Plan that (1) the benefits would not be equal and (2) the ratio would be roughly three-to-one. Documents showed that the parties roughly split their contributions to the Plan 75 percent and 25 percent. The parties' contributions into the Plan were roughly in the ratio of three-to-one, and the benefits received by the parties at final distribution were consistent with this formula. Yanina, as a Plan trustee, had access to the Plan's two Schwab accounts during the marriage. One of her fiduciary duties as a trustee was to ensure the accuracy of any contributions to the Plan.

When asked if the three-to-one ratio should also exist where there is an underfunding, Mark's expert witness explained that the rough three-to-one

_____

[10]     Yanina discussed none of this evidence in her opening brief in violation of her duty to discuss and analyze all evidence. (*Doe, supra,* 177 Cal.App.4th at p. 218.)

27

ratio existed in the ultimate dollar amount received and that each party had simply waived down to the assets in their Schwab accounts and that the assets in the Schwab accounts were roughly three-to-one. She viewed this fact pattern as being consistent with the parties' understanding over the years. Notably, she saw no documentation before 2014 where Yanina questioned her compensation figures or benefit calculations and was unaware of any complaints by Yanina during the existence of the Plan regarding the benefit calculations.

We also reject Yanina's argument that this percentage breakdown would have violated the Plan terms and jeopardized its tax-advantaged status. In support of this argument, Yanina relies on IRS documents to conclude that any agreement by the parties would have violated their fiduciary obligations as trustees of the Trust. Yanina, however provided no analysis showing how these documents support her arguments. "Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.) Accordingly, we treat the contention as waived. (*Ibid.*)

Finally, Yanina claims that she never waived her right to recalculation of the Plan benefits and argues that the trial court erroneously relied on possible adverse tax consequences as a reason to deny her claim for recalculation. Because we reject Yanina's contention that she is entitled to recalculation of the Plan benefits, we need not address these contentions.

## V.

### *Salary Reimbursement*

A. Additional Background

In their PMA, the parties agreed that all "earnings, income, employee benefits, and retirement benefits resulting from Yanina's personal services, skill, effort and work during the marriage" shall remain her separate property. Mark specifically acknowledged "that, except for this Agreement, the earnings and income resulting from Yanina's personal services, skill, effort and work throughout their marriage would be community property, and, that by this Agreement, such earnings and income during their entire marriage are constituted her separate property."

The parties expressed the intent to create joint checking and savings accounts and agreed that "[f]unds deposited in those accounts shall be community property" and neither party had "any right to be reimbursed for funds he or she deposits into those accounts." Regarding living expenses, the parties agreed:

> "7.1 The parties, in entering into this Agreement, have not created an exact formula by which each party shall contribute to their mutual living expenses. However, each party may contribute to the joint checking account provided for in Paragraph 6 above from which the mutual living expenses may be paid. **So long as Yanina is not employed, it is anticipated Mark shall provide the monies for the parties' mutual living expenses.**

> "7.2 The parties agree that when either of them contributes any of his or her separate income or property, as defined in this Agreement, to their family living expenses in order to achieve or maintain the standard-of-living desired by them, the party so

29

contributing shall have no right thereafter to seek reimbursement for any part of such contributions unless otherwise hereafter expressly agreed between them in writing and that such contribution shall not otherwise affect the terms and conditions of this Agreement." (Bolding added.)

In her trial brief, Yanina sought reimbursement for her separate property wages that Mark placed into his account. Yanina alleged that "[Mark] controlled and usurped [her] wages and corporate profits by . . . exercising dominion over her separate property wages for spending on mutual expenses which he was supposed to fund per [the] PMA [Paragraph] 7.1." Yanina requested an "accounting and reimbursement of [her] separate property wages earned from 2003 to 2013 with prejudgment interest."

Brinig determined that Yanina received total compensation of $447,000 during the marriage. Of the $447,000 gross, he concluded that $141,800 was deposited into community accounts, $36,286 was deposited by someone into Mark's separate account, and $234,000 was not traceable into separate property accounts. Regarding the untraceable money, Brinig told to court to not "infer anything suspicious" and stated that he simply did not have the detailed payroll records needed to trace this money.

Regarding the $36,286 deposit into Mark's separate account, Brinig found that two days after this deposit, $10,000 was removed from Mark's separate account and deposited into a joint account; 20 days later, another $20,000 was removed from Mark's account and deposited in a joint account; and two weeks after that, another $10,000 was removed and deposited into the couple's joint account.

30

The court's statement of decision noted Yanina's testimony that her MDNA salary was never placed into her separate property accounts and that she sought $477,000 plus 10 percent prejudgment interest for all wages paid to her during the time she worked for MDNA. The court found Yanina's position to be "unreasonable" because it "assume[d] that she had no obligation to contribute to the community expenses including her children's living expenses." The court concluded that on December 31, 2007, $36,286.67 of Yanina's wages had been deposited into Mark's separate property account, but shortly thereafter, Mark transferred $40,000 to the parties' joint accounts. The court found this transaction to be "de minimis." Regarding the remainder of Yanina's allegedly missing salary, the court rejected Yanina's testimony that she had no control over the joint accounts and that Mark directed that her paychecks be deposited into the parties' joint accounts.

B. Analysis

Yanina argues that denial of her MDNA salary reimbursement claim defied reason and is unsupported by any substantial evidence. We conclude that substantial evidence supported the denial of Yanina's reimbursement claim.

After noting that Yanina received no child support during the entirety of the marriage, the court rejected Yanina assertion that she had no "obligation" to contribute to community expenses. The court found that Yanina's position unreasonably assumed she need not contribute to community expenses which included her children's living expenses, college tuition of at least $150,000, a Jaguar given to her son, funds contributed to her defined benefit plan, or any of her expenses.

31

Yanina first argues the trial court erred because she had no "obligation" under the PMA to contribute to community expenses. The term "obligation" "has many wide and varied meanings. It may refer to anything that a person is bound to do or forbear from doing, whether the duty is imposed by law, contract, promise, social relations, courtesy, kindness, or morality." (Black's Law Dict. (11th ed. 2019) p. 1292, col. 1.) Thus, the word is ambiguous. As a threshold matter, the court did not find that Yanina had a "legal," "contractual," or "promissory" obligation to contribute to the parties' community expenses. Accordingly, the court necessarily found that Yanina's obligation was a matter of social relations, courtesy, kindness, or morality.[11]

In their PMA, the couple agreed as follows regarding their living expenses, "*each party may contribute to the joint checking account* provided for in Paragraph 6 above from which the mutual living expenses may be paid. *So long as Yanina is not employed, it is anticipated Mark shall provide the monies for the parties' mutual living expenses*." (Italics added.) The italicized language shows that although Yanina had no contractual obligation under the PMA to contribute to community expenses, the couple expected that if employed during the marriage, she might voluntarily contribute to mutual living expenses.

It is undisputed that Yanina contributed to the couple's mutual living expenses. Yanina testified that MDNA was her only paid employment during

---

[11] A party may file objections to a proposed statement of decision. (Cal. Rules of Court, rule 3.1590(g).) Here, the court's proposed statement of decision and statement of decision contained the same language regarding Yanina's "obligation" to contribute to community expenses. Although Yanina objected to the court's proposed statement of decision, she never sought clarification of the meaning of this word. (Code Civ. Proc., § 634 [parties have a duty to bring any ambiguities in the statement of decision to the trial court's attention].)

32

the marriage.  The court's expert determined that Yanina received total compensation during the marriage of $447,000 and that $141,800 of this amount was deposited into community accounts.  The court's expert could not trace $234,000 of Yanina's total compensation into separate property accounts.  Accordingly, we will assume that these funds were also deposited into the couple's joint accounts.

The critical question is whether Yanina voluntarily deposited these funds into the couple's joint accounts or whether Mark forced her to do so. On this issue, the trial court rejected Yanina's testimony that she had no control over the joint accounts and that Mark directed that her paychecks be deposited into the parties' joint accounts.  Substantial evidence supports this conclusion.

Yanina argues she had no control over the joint accounts, but cited no evidence supporting this assertion and we have no obligation to search the record looking for such evidence.  (*Grant-Burton*, *supra*, 99 Cal.App.4th at p. 1379.)  In contrast, Mark testified that Yanina had "complete" access to the joint account statements during the marriage, including online access and that she reviewed the accounts "regularly."  He estimated that Yanina wrote over 95 percent of the checks during the marriage.

Mark testified that Yanina was MDNA's CEO and that she handled the check ledger for the corporation.  She also set up the payroll service, including its distribution and choose the account to which her paycheck was deposited.  Mark denied Yanina's claim that he required her to deposit her MDNA paychecks into a joint account.

Yanina admitted that Mark placed his salary into their joint checking account to pay day-to-day expenses for them and their four children.  During the divorce she discovered that her MDNA paychecks were never deposited

33

into her personal accounts. Instead, her paychecks were deposited into the couple's joint checking account. Regarding her MDNA salary, Yanina testified:

> "I did not make a decision where it was being deposited. I actually didn't really know where it went. And nobody asked me whether I agree that it would be deposited into the joint account. [¶] My understanding was that Mark is doing the best he can to keep the company operational and that whatever is going to be of benefit will be divided equal."

Yanina's testimony shows she did not know where her MDNA paychecks were deposited and did not learn they had been deposited into the couple's joint accounts until the divorce. Thus, according to Yanina, Mark did not force her to deposit her paychecks into joint accounts and she did not voluntarily do so, but rather, over the course of the marriage, she simply did not know where her paychecks went.[12]

The court also concluded that $36,286 of Yanina's salary had been deposited by someone into Mark's separate account, but found this "de minimis." The record supports this conclusion. The court's expert noted that

---

[12]     The court disbelieved Yanina's testimony that she had no control over the parties' joint accounts and that Mark directed that her paychecks be deposited into the joint accounts. Yanina asserts this conclusion necessarily implies that she willingly allowed, or affirmatively chose, to deposit her paychecks into either a joint account or into one of Mark's separate property accounts. She contends this implied finding is unreasonable and incredible.

The court found neither party credible. The court's conclusion regarding Yanina's credibility, however, does not "necessarily" imply that she voluntarily chose to not deposit her paychecks into her separate accounts. Rather, as we indicated, Yanina testified that she did not know where her MDNA paychecks were deposited.

two days after this deposit, $10,000 was removed from Mark's separate account and deposited into a joint account; 20 days later, another $20,000 was removed from Mark's account and deposited in a joint account; and two weeks after that, another $10,000 was removed and deposited into the couple's joint account.

In a confusing argument, Yanina asserts that the trial court committed legal error by denying her MDNA salary reimbursement claim because she made contributions to the Plan from her total wages and received a $775,900 payout from the Plan in 2014. The portions of the statement of decision cited by Yanina to support this contention do not support her assertion that the trial court denied her salary reimbursement claim based on her subsequent Plan payout. Rather, as we discussed, the court rejected her reimbursement request because the court did not believe her claim that Mark directed that her salary be deposited into the parties' joint accounts.

In summary, the record supports the trial court's conclusions and we decline to second-guess the trial court's credibility findings.[13] (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968 [reviewing court must defer to the trier of fact's credibility determinations].)

---

[13] We acknowledge Mark's assertion that Yanina's MDNA wages were actually his property because they existed due to his earnings. This contention, however, does not impact our analysis of this issue.

## DISPOSITION

The appeal is dismissed.  Let a peremptory writ of mandate issue vacating:  (1) paragraph 32 of the court's April judgment addressing income taxes; (2) that portion of the August 30, 2019 order after hearing adopting Addleman's report; and (3) that portion of the November 4, 2019 order after hearing regarding the income tax issue.  The matter is remanded to the trial court for further proceedings on the income tax issue.  Each party is to bear his or her own costs in this proceeding.  **OR**  Respondent is entitled to his costs.

O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.

36